**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**DEVERICK SCOTT**                                                    **PLAINTIFF**

**v.**                         **No. 5:17-cv-00098 DPM-PSH**

**DANNY BURL,** *et al.*                                          **DEFENDANTS**

## FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following proposed Recommendation has been sent to United States District Judge D.P. Marshall Jr. You may file written objections to all or part of this Recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation.  By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

### I.  Introduction

Plaintiff Deverick Scott ("Scott"), an inmate at the Arkansas Department of Correction's ("ADC") Varner Supermax Unit, filed a complaint on April 4, 2017, asserting claims under 42 U.S.C. § 1983, state tort law, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  *See* Doc. No. 1 at 1.  Scott sues Danny Burl, former Warden of the Maximum Security Unit ("MSU"); former MSU Deputy Warden

Aundrea Fitzgerald (identified as Warden Weekly in Scott's Complaint and now known as Audrea Culclager);[1] Major Carl Stout; Lieutenant Richard Clark; Sergeant and Property Officer Angelah Kennedy; Lieutenant Cochoran; Sergeant Cornelius Christopher; Sergeant Eddie Thompson; Hunter Neal; Crystal Neese; Business Operations Specialist Reena Harrison; and ADC Director Wendy Kelley, in their official and individual capacities. *Id.* Scott sues for compensatory and punitive damages. *Id*. at 7-8.

Scott's lawsuit pertains to his housing in punitive isolation at the MSU between March 3, 2015 and February 5, 2016. Doc. No. 1. Scott's complaint describes four claims. *See* Doc. No. 38 at 4. First, Scott alleges that Kennedy wrongfully confiscated and destroyed certain personal property belonging to Scott on December 15, 2015, in retaliation for his use of the grievance procedure. Doc. No. 1 at 4, ¶ 46. Scott further alleges that Kelley, Stout, Clark, Burl, and Christopher failed to take corrective action with respect to Kennedy's alleged retaliation. *Id.* Second, Scott alleges that Kelley, Burl, Weekly (Fitzgerald/Culclager), Stout, and Harrison created a policy that would not allow him to have personal hygiene items while in punitive segregation. *Id.* at 4-5, ¶ 47. Scott also alleges that Stout retaliated against him for writing grievances by not signing his indigent hygiene slips. Third, Scott alleges that Cochoran, Clark, and Stout refused to allow Scott to be escorted to the infirmary until he took his hair down and that his hair was up because of his religious beliefs. *Id.* at 5-6, ¶ 48. Scott claims he was denied adequate medical care

---

[1] Culclager was the Deputy Warden at the MSU from October 25, 2015, until November 20, 2016. *See* Declaration of Aundrea Culclager, Doc. No. 44-5 at 1. Culclager is now the Warden of the MSU. *Id.*

as a result. *Id.* Finally, Scott alleges that he was given a false disciplinary for possessing a shank in retaliation for writing grievances against Kennedy. *Id.* at 6, ¶49. Specifically, Scott alleges that Kennedy conspired with Thompson to write a false disciplinary stating that Kennedy found a shank in a holding cell occupied by Scott. *Id.* Scott further claims that Neal and Neese conspired to cover up Kennedy and Thompson's conspiracy. *Id.*

Scott's claims against Cochoran were dismissed because Scott did not provide an address for service for Cochoran. *See* Doc. Nos. 21 & 22. Scott's corrective inaction claim against Burl, Kelley, and Christopher was dismissed for failure to exhaust administrative remedies, and Scott's false disciplinary claims against Neal and Neese were similarly dismissed. *See* Doc. Nos. 38 & 39. Scott's other claims remain pending.

Before the Court is a motion for summary judgment and related pleadings filed by the remaining defendants (Doc. Nos. 44-46). Scott filed a response, brief in support, and statement of disputed factual issues (Doc. Nos. 50-52). Defendants filed a reply (Doc. No. 54). For the reasons described herein, the undersigned recommends that defendants' motion for summary judgment be granted.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely

on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". FED. R. CIV. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

## III. Discussion

### A.    *Sovereign Immunity*

Defendants correctly assert that Scott's monetary claims against them in their official capacities are barred by sovereign immunity.[2]  A suit against a defendant in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity.  *Will v. Michigan Department of State Police, et al.*, 491 U.S. 58, 71 (1989); *Nix v. Norman*, 879 F.2d 429, 431-432 (8th Cir. 1989).  Accordingly, the undersigned recommends that defendants be awarded summary judgment with respect to Scott's official capacity claims.

### B.    *Qualified Immunity*

Defendants assert they are entitled to qualified immunity with respect to Scott's individual capacity claims.  Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Qualified immunity is a question of law and is appropriately resolved on summary judgment.  *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation

---

[2] Scott does not seek injunctive relief.  Doc. No. 1 at 7-8.

of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1. Personal Hygiene Items:  Defendants Kelley, Burl, Culclager, Stout, & Harrison

Scott alleges that his First, Eighth, and Fourteenth Amendment rights were violated because Kelley, Burl, Culclager, Stout, and Harrison failed to train and supervise staff. He also claims they were deliberately indifferent to his health and safety by creating a punitive segregation policy that forced Scott to go over 30 days without buying hygiene necessities. Doc. No. 1 at 4-5, ¶ 47. Additionally, Scott alleges that Stout retaliated against him for writing a grievance by refusing to sign off on indigent hygiene slips. *Id.* Defendants argue they are entitled to summary judgment because: (1) the named defendants were not responsible for creating MSU's punitive segregation policy; (2) the policy does allow inmates to possess and purchase personal hygiene supplies while in punitive isolation; and (3) Scott in fact purchased hygiene supplies while in punitive isolation. *See* Doc. No. 45.

a.  *Undisputed Facts*[3]

---

[3] The facts provided by defendants in their statement of facts are mostly undisputed by Scott. *See* Doc. No. 52. Facts disputed by Scott are noted. The documents referred to were provided by defendants. *See* Doc. Nos. 44 & 54.

*i.    Relevant ADC Policies*

Punitive segregation at the MSU is governed by Administrative Directive (AD) 12-24 "Punitive Segregation/Restriction"[4] and MS 10.02.0.  The ADC also has a dental policy that provides inmates with dental supplies.

AD 12-24 explains the purpose for punitive segregation, and defines and explains the procedures regarding punitive segregation. Doc. No. 44-11. These procedures encompass commissary, showers, personal property, and cleanliness/grooming, among other things.  *Id.*  Specifically, the policy reads, in part, as follows:

> Inmates may be confined to punitive segregation for a period of up to 30 days.
>
> Inmates serving consecutive punitive isolation sentences will receive 48-hour relief at the end of each 30-day sentence. Inmate privileges as previously outlined in this policy will be restored during the 48-hour relief period and will be restricted again at the beginning of the next punitive sentence. An inmate's telephone privilege will not be restored during 48-hour relief if the privilege was suspended due to a conviction of disciplinary rule violation 02-5, 09-13 or 17-3. Commissary purchases may be made by an inmate only if the inmate's 48-hour relief falls on their regularly scheduled commissary day, and will be limited to a quantity that can reasonably be consumed in 48 hours. Inmate personal property privileges as previously outlined in paragraph A (9) of this policy will remain in effect.

*Id.* at 7.   The MSU's punitive segregation policy, MS 10.02.0, was created by the unit

---

[4] AD 12-24 became effective in 2012.  It is based on Administrative Regulation (AR) 839.  Defendants did not create AR 839.  Doc. No. 46 at 12; Doc. No. 52 at 6.   ADs are authorized by the Director.  *See* Administrative Regulation 001, Doc. No. 44-9 at 1.  Ray Hobbs was the ADC Director in 2012.  Doc. No. 46 at 12; Doc. No. 52 at 6.  Wendy Kelley was not the ADC Director in 2012.  *See* Declaration of Wendy Kelley, Doc. No. 44-20 at 2.

warden.[5]  Doc. No. 44-12.  It is the unit policy that tracks both AD 12-24 and AR 839.  *Id.* Pursuant to MS 10.02.0, inmates in punitive segregation are allowed to possess (among other things): soap, toothbrush, toothpaste, toilet paper, a comb, and deodorant.  *Id.* at 4-5.[6]  The policy further provides that inmates may not purchase commissary items while in punitive isolation unless they are on their 48-hour relief period and the commissary is open.  *Id.* at 4.  Inmates in punitive segregation are afforded the opportunity to shave and shower three times per week, after which each inmate will be given a fresh change of clothing.  *Id.* No substantive changes were made to MS 10.02.0 during Warden Burl's tenure.  *See* Declaration of Danny Burl, Doc. No. 44-13.

ADC Dental Policy 1000.00 "Dental Services" states that each inmate will be provided with one toothbrush upon admission, and quarterly thereafter.  Doc. No. 44-8. The policy further provides that each inmate will be provided with a 1.5 ounce tube of toothpaste on a monthly basis. In addition, if items are lost or damaged, the inmate is to inform the health care services staff, which will issue a replacement.  Doc. No. 44-8 at 2.

       *ii.*    *Stays in Punitive Isolation/Purchase of Hygiene Supplies*

On March 3, 2015, Scott was transferred from the Varner Unit to the MSU.  *See* Scott's status assignment sheet from May 26, 2004, to April 24, 2017.  Doc. No. 44-1 at 5. He was housed in isolation between March 3 and March 10, 2015.  *Id.*  Scott made a large

---

[5] Each ADC unit has its own unit policies.  Doc. No. 44-5 at 1.  Unit policies are created by the unit wardens.  Unit policies follow the ARs and ADs and are tailored to the particular unit. *Id.*

[6] Scott points out that while inmates are allowed to have these things in punitive isolation, they are not allowed to buy them while in punitive isolation.  Doc. No. 52 at 6-7.

purchase from the MSU commissary on March 16, 2015, which included three bars of soap, a toothbrush, and shower shoes.  Doc. No. 44-2 at 3.

Scott was next housed in isolation between March 24 and April 22, 2015, after being found guilty of a Major Disciplinary.  Doc. No. 44-1 at 4.  Two days after being released from isolation, on April 24, 2015, Scott purchased toothpaste, deodorant, and two bars of soap from the MSU commissary.  *Id.*

Scott was next housed in isolation between May 19 and June 18, 2015, after being found guilty of another Major Disciplinary.  Doc. No. 44-1 at 4.  On June 29, 2015, Scott visited the MSU commissary, where he purchased fingernail clippers but no other hygiene products.  Doc. No. 44-2 at 4.

Between July 30, 2015, and February 5, 2016, Scott was housed in punitive isolation because of numerous disciplinaries he received which resulted in consecutive sentences of 30 days in isolation.  Doc. No. 44-1 at 3.  During that time, he received 48-hour relief on August 29, September 29, October 30, November 30, and December 31, 2015, and on January 31, 2016.[7]  Doc. No. 44-1 at 2-3.  Also during that time, commissary records reflect that Scott was allowed to purchase hygiene items on September 17, 2015 (toothpaste, hair food, deodorant, six lotions, and two soap bars); November 3, 2015 (hair cream, deodorant,

---

[7] Scott states that in September, October, and November of 2015, he was not moved to a different cell for his 48-hour relief from isolation.  Doc. No. 51 at 5 (citing Doc. No. 51 at 79 & 105 and Doc. No. 44-2 at 5 & 6).  Scott's status assignment sheet shows that Scott was moved for 48-hour relief in September 2015 but not in October or November 2015.  Doc. No. 44-1 at 2.  Scott has not shown why this is a material fact.  In another case filed by Scott, Judge Joe J. Volpe found that "neither the constitution nor ADC policy requires that an inmate be moved from one cell to another during a relief period."  *See Scott v. Kelley,* No. 5:17-cv-00272 JM (Doc. No. 75 at 7-8 and Doc. No. 76 adopting the recommendation).

toothpaste, hair food, lotion, and curl activator); December 21, 2015 (hair cream, toothpaste, hair food, a toothbrush, six lotions, baby powder, three shampoos and conditioners, three bars of moisturizing soap, and deodorant); and February 1, 2016 (hair gel, two toothpastes, and two soap bars).  Doc. No. 44-2 at 5, 6.  Scott was transferred from the MSU to the Varner Supermax Unit on February 5, 2016.  Doc. No. 44-1 at 1.

> ### b.  Analysis
>
> #### i.    Eighth & Fourteenth Amendment Claims

To prevail on an Eighth Amendment conditions of confinement claim, a prisoner must show (1) the alleged deprivation was, "objectively, sufficiently serious," and resulted "in the denial of the minimal civilized measure of life's necessities," and (2) prison officials were deliberately indifferent to "an excessive risk to inmate health or safety."  *Farmer v. Brennan,* 511 U.S. 825, 834 (1970).  The length of time a prisoner is exposed to unsanitary conditions is relevant to the Court's analysis as is the extent of the unclean conditions.  *See Owens v. Scott County Jail,* 328 F.3d 1026, 1027 (8th Cir. 2003).  To prevail on a Fourteenth Amendment Due Process claim, Scott must show that the conditions he endured in punitive isolation resulted in an "atypical and significant hardship."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Scott's Eighth and Fourteenth Amendment claims fail because he does not establish that he was denied the minimal civilized measure of life's necessities, and fails to establish that the conditions he endured resulted in an atypical and significant hardship. The uncontroverted facts establish that Scott was able to purchase adequate hygiene supplies on a regular basis, even while in punitive isolation.  Scott has also failed to provide

evidence that he was refused hygiene supplies at any time or that he did not possess any hygiene supplies from previous purchases while in isolation.

A review of grievances cited by Scott indicates that his main complaint is that his 48-hour relief periods occurred on weekends or holidays when the commissary was not open, and he could therefore not purchase hygiene items he wanted. *See* Doc. No. 51 at 36 & 39. Scott filed the grievances at issue on January 20 and 25, 2016. *Id.* In MX-16-342, submitted on January 25, he claimed he had not been to the commissary in over six and one-half weeks. *Id.* at 39. The record, however, shows that it had been just over one month since Scott purchased hygiene products on December 21, 2015. Doc. No. 44-2 at 6. Those products included hair cream, toothpaste, hair food, a toothbrush, lotions, baby powder, shampoo, conditioner, three bars of soap, and deodorant. *Id.*

Scott's next 48-hour relief period fell on a Thursday, December 31, and ended on Saturday, January 2. Doc. No. 44-1 at 2. The record does not indicate whether the commissary was closed on December 31, New Year's Eve, or January 1, New Year's Day. If it was closed on those days, Scott may have missed the opportunity to purchase hygiene products during that particular 48-hour relief period. However, he had just purchased numerous hygiene products 10 days before that. Doc. No. 44-2 at 6. Scott does not explain why those products would not have lasted until his next 48-hour relief period, which began on January 31, 2016.[8] Doc. No. 44-1 at 2. Scott next purchased hygiene supplies on

---

[8] The record shows that Scott purchased toothpaste, deodorant, and two bars of soap on April 24, 2015. Doc. No. 44-2 at 4. He was able to purchase more supplies after his next stay in punitive which ended on June 18, 2015. Doc. No. 44-1 at 3. However, he only purchased fingernail clippers on June 29, 2015, and was not in punitive isolation again until July 30, 2015.

February 1, 2016, 42 days after his last purchase.  Doc. No. 44-2 at 6.  At that time, he purchased hair gel, toothpastes, and two soap bars.  *Id.*  The record of purchases simply does not support a finding that Scott was required to go without hygiene supplies while in punitive isolation.

The record also shows that Scott was able to purchase hygiene supplies not only during 48-hour relief periods, but also while he was in punitive isolation.  He purchased hygiene supplies on March 16, April 24, June 29, September 17, and November 3, 2015.  Doc. No. 44-2 at 3-6.  Scott's purchases on September 17, November 3, and December 21 occurred while he was in punitive isolation, and not during a 48-hour break.  The November 3 purchase occurred just after a 48-hour relief period that fell on a weekend.  In sum, the record shows that Scott was able to purchase hygiene supplies every month to six weeks while he was housed in punitive isolation, even if he missed one opportunity to purchase hygiene supplies on a 48-hour relief period.

The undisputed facts establish that Scott purchased and had access to hygiene supplies on a regular basis while he was housed in punitive isolation.  Accordingly, Scott cannot establish that he was denied the minimal civilized measure of life's necessities, which is necessary to establish an Eighth Amendment violation.[9]  Nor can Scott show that

---

Doc. No. 44-2 at 4; Doc. No. 44-1 at 3.  He did not purchase hygiene products again until September 17, 2015, even though he had a 48-hour relief period on August 29-31 that did not fall on a weekend.  Doc. No. 44-2 at 5; Doc. No. 44-1 at 3.  The supplies purchased on June 18, 2015, presumably lasted until September 17, 2015.  This indicates that the supplies Scott purchases through the commissary are capable of lasting more than one month.

[9] Because Scott was not subjected to an objectively, sufficiently serious deprivation that resulted in the denial of the minimal civilized measure of life's necessities, the Court does not reach his claim that certain defendants failed to train their staff regarding the purchase of hygiene

he was subjected to an atypical and significant hardship while housed in punitive isolation, which is necessary to establish a Fourteenth Amendment due process claim. Because Scott cannot establish a violation of his constitutional rights, defendants are entitled to summary judgment on Scott's Eighth and Fourteenth Amendment claims.

ii. *First Amendment Retaliation*

Scott also claims he was denied hygiene supplies in January 2016 in retaliation for writing a grievance against Stout. Doc. No. 1 at 5. Scott's brief in response to defendants' motion for summary judgment cites grievance MX-15-3367 dated December 27, 2015, which names Stout. *See* Doc. No. 51 at 5 & 26. Scott's response further explains that he was allowed to purchase hygiene supplies in punitive isolation until January 2016, when he wrote the grievance naming defendant Stout. *Id.* at 5. Scott claims that defendants Stout, Culclager, and Harrison then denied him basic hygiene items on his 48-hour relief in early January 2016. *Id.* at 5-6 (citing Doc. No. 51 at 36-42).

To succeed on a § 1983 retaliation claim, a plaintiff must prove that he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against the plaintiff that would chill a person of ordinary firmness from engaging in

---

supplies. In any case, Scott alleges insufficient facts to establish a failure to train/supervise claim. *See Parrish v. Ball,* 594 F.3d 993, 1002 (8th Cir. 2010) (plaintiff asserting failure to supervise and train staff must show that supervisor "1) Received notice of a pattern of unconstitutional acts committed by subordinates; 2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts; 3) Failed to take sufficient remedial action; and 4) That such failure proximately caused injury to [Plaintiff]."). Scott does not describe what training or supervision was lacking or how any lack of training or supervision caused him harm. He does not allege that defendants were aware of any such lack of training or supervision and failed to take remedial action. In sum, Scott describes no facts to support his bald assertion that defendants should better train or supervise their staff.

that activity. *See Lewis v. Jacks*, 486 F.3d 1025, 1028–29 (8th Cir. 2007) (citing *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004)). The plaintiff must also provide affirmative evidence of a retaliatory motive. *See Haynes v. Stephenson,* 588 F.3d 1152, 1157 (8th Cir. 2009); *see also Wilson*, 441 F.3d at 592 ("[Plaintiff's] belief that [defendant] acted from a retaliatory motive is insufficient.").

Scott's allegations do not describe an actionable retaliation claim. Scott provides no facts to show how defendants Stout, Culclager, and Harrison were personally involved in his inability to purchase or obtain hygiene items during his 48-hour relief in early January 2016, and he does not explain why he believes Culclager and Harrison would retaliate against him for writing a grievance naming Stout. Scott contends that two grievances he filed after the alleged retaliatory acts constitute evidence of defendants' retaliatory motive. Doc. No. 51 at 5-6. In those grievances, MX-16-342 and MX-16-203, Scott complained that he was not allowed to buy hygiene supplies while in punitive isolation. Doc. No. 51 at 36-42. Those grievances reflect Scott's complaints but do not establish a retaliatory motive on the defendants' part.

Additionally, the Court notes that Scott purchased a significant supply of hygiene items on December 21, 2015 (including toothpaste, a toothbrush, soap, shampoo and deodorant), just 10 days before his 48-hour relief period began on December 31, 2015. Even if defendants prevented Scott from purchasing additional supplies in January 2016, as he contends, such actions would not deter a person of ordinary firmness from filing grievances in the future. *See Santiago v. Blair,* 707 F.3d 984, 992 (8th Cir. 2013) ("[U]nder *Revels* a prisoner must demonstrate not only that a correctional officer took an adverse

action, but that the action "would chill a person of ordinary firmness from continuing in the [protected] activity."; *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003) ("The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment.").[10]   Accordingly, Stout, Harrison, and Culclager are entitled to summary judgment on Scott's retaliation claim.

2.   Retaliation and Failure to Correct Claims: Kennedy, Stout & Clark

Scott alleges that Kennedy wrongfully confiscated and destroyed certain personal property belonging to him on December 15, 2015, in retaliation for his use of the grievance procedure.[11]   Doc. No. 1 at 4, ¶ 46.  Scott brought a nearly identical retaliation claim against Kennedy in *Scott v. Kelley et al.,* 5:16-cv-00065 ("*Scott v. Kelley I*").  In *Scott v. Kelley I*, Scott alleged that Kennedy took and destroyed certain personal property in March 2015.  *Scott v. Kelley I*, Doc. No. 5 at 12-14.  His claims against Kennedy were dismissed with prejudice.  *See Scott v. Kelley I*, Doc. Nos. 61 & 65.  Scott objects to the defendants'

---

[10] *See also Doering Reed*, No. 6:15-CV-06093, 2016 WL 3148642, at *3 (W.D. Ark. Apr. 29, 2016), *report and recommendation adopted sub nom. Doering v. Reed*, No. 6:15-CV-6093, 2016 WL 3162137 (W.D. Ark. June 3, 2016) ("Speculative and conclusory, or *de minimis* allegations, however, cannot support a retaliation claim.").

[11] The Court construed Scott's complaint as stating a claim for retaliation in connection with the destroyed property; the Court did not construe it as attempting to state a constitutional claim for the destruction of property.  Such a claim fails as a matter of law because Arkansas provides an adequate post-deprivation remedy.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (unauthorized deprivation of property does not constitute violation of procedural due process if meaningful post-deprivation remedy is available); *Willis Smith & Co., Inc. v. Arkansas,* 548 F.3d 638, 640 (8th Cir. 2008) (Arkansas provides adequate post-deprivation remedy for property claims through the Arkansas State Claims Commission).

reliance on the outcome of those claims.  Because Scott's allegations against Kennedy in this case arise from an incident that occurred in December 2015, the Court will examine whether Scott's retaliation claim against Kennedy withstands summary judgment without reference to *Scott v. Kelley I*.

### a. Undisputed Facts

On December 15, 2015, a number of items, including pornography and numerous pills,[12] were confiscated from Scott's isolation cell by non-party ADC staff members.[13] *See* Confiscation Forms dated December 15, 2015, Doc. No. 44-6.  The items confiscated were claimed to be contraband by the ADC, and non-party officer Joseph Watson issued Scott a Major Disciplinary for three ADC rule violations.  *See* Major Disciplinary, Doc. No. 44-7 at 1.  According to AD 14-03 (the ADC's inmate property control policy), ADC staff must secure confiscated items which are to be used for disciplinary, grievance, or judicial proceedings until those proceedings are complete.  Doc. No. 44-17 at 5.  A disciplinary may be written on all confiscated property as unauthorized, excessive, or contraband.  *Id.*  The policy provides that "contraband will be destroyed."  *Id.*

On December 18, 2015, Stout reviewed the disciplinary and referred it to the Disciplinary Hearing Office to schedule a hearing.  Doc. No. 44-7 at 1.  Scott was notified of the disciplinary charges later that day.  *Id.*  On December 22, 2015, Scott appeared before

---

[12]  The list of confiscated property does not include hygiene supplies.  Doc. No. 44-6.

[13]  Scott disputes this fact because he contends that former party Christopher was present. Doc. No. 52 at 4.  Christopher's presence is not a material fact.

Disciplinary Hearing Officer Justine Minor for his disciplinary hearing. *Id.* at 2. Scott was found guilty of a Major Disciplinary for two rule violations, including being an inmate in possession of several items of contraband. Doc. No. 46 at 9; Doc. No. 52 at 4. He was sentenced to serve 10 days in isolation and was reduced in class to Class IV. *Id.* Scott did not appeal the disciplinary findings. Doc. No. 44-7 at 3. Scott disputes that the items should be considered contraband. Doc. No. 52 at 4-5. The items determined to be contraband were destroyed by Kennedy, and Scott claims their destruction was in retaliation for his use of the grievance process.

### b. Analysis

A plaintiff bringing a § 1983 retaliation claim must prove that he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against the plaintiff that would chill a person of ordinary firmness from engaging in that activity. *See Lewis v. Jacks*, 486 F.3d 1025, 1028–29 (8th Cir. 2007) (citing *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004)). In *Revels*, the Eighth Circuit Court of Appeals held that the plaintiff must prove a causal connection between the constitutionally protected activity and the adverse action. 382 F.3d at 876. The plaintiff must also provide affirmative evidence of a retaliatory motive. *See Haynes v. Stephenson,* 588 F.3d 1152, 1157 (8th Cir. 2009); *see also Wilson*, 441 F.3d at 592 ("[Plaintiff's] belief that [defendant] acted from a retaliatory motive is insufficient.").

Defendants argue there is no evidence that Kennedy retaliated against Scott, because Kennedy was merely performing her job when she destroyed certain property that was found to be contraband in a disciplinary hearing. *See* Doc. No. 45 at 10-12. It is undisputed

that Kennedy did not confiscate the property at issue on December 15, 2015.  Doc. No. 44-6.  Officer Joseph Watson (a non-party) found the property during a cell search and issued Scott a Major Disciplinary.  Scott was found guilty of a Major Disciplinary for two rule violations, including being an inmate in possession of several items of contraband.  ADC policy instructs staff to secure confiscated items which are to be used for disciplinary proceedings until the proceedings are complete.  The policy clearly provides that contraband will be destroyed.  The undisputed facts in the record show that Kennedy simply performed her duties by destroying the property that was deemed contraband during the disciplinary process.

Scott maintains that a property confiscation form proves that Kennedy acted with a retaliatory motive.  *See* Doc. No. 51 at 5 (citing Doc. No. 51 at 43).  This form only shows that property was taken by Corporal Jones and Officer Watson after a search was conducted; the form does not mention Kennedy.  Scott also claims that the property was there solely because defendants did not move him to a different cell for 48-hour relief, brought his personal property to him, and then failed to remove his personal property after his 48-hour relief period ended.  Doc. No. 51 at 4.  Even if true, these facts do not establish that Kennedy acted with retaliatory motive when she destroyed the contraband. Additionally, Scott does not point to any grievance he submitted that he claims resulted in retaliatory action by Kennedy. In sum, there is no evidence in the record to show that Kennedy did anything other than perform her job with respect to Scott's property. Accordingly, Scott cannot establish a retaliatory motive on Kennedy's part or a causal connection between any grievance he may have filed and Kennedy's actions.  Kennedy did

not take his property, and she only destroyed it because it was determined to be contraband. Kennedy is therefore entitled to summary judgment on this claim.

Likewise, Scott's claim that Stout and Clark failed to take corrective action with respect to Kennedy's alleged retaliation also fails. *Id.* Doc. No. 1 at 4, ¶ 46. Because there is no evidence that Kennedy acted wrongfully, Stout and Clark cannot be held liable for failing to take corrective action. They are also entitled to summary judgment on this claim.

3. <u>Infirmary/Hair Incident: Defendants Clark & Stout</u>

Scott alleges that Clark and Stout refused to allow him to be escorted to the infirmary for treatment until he took his hair down – he claims his hair was up because of his religious beliefs. Doc. No. 1 at 5-6, ¶ 48. Scott claims that because he was not allowed to go to the infirmary, he suffered pain in his jaw for hours, could not eat, and had migraine headaches that interfered with his sleep. *Id.* Scott also claims he was not allowed to exercise his religious beliefs and customs. *Id.*

**a. *Undisputed Facts***

On May 21, 2015, Administrative Directive 15-08 "Personal Cleanliness and Grooming for Inmates" went into effect. Doc. No. 44-3 at 1. AD 15-08 states that "inmates' hair must be worn loose, clean, and neatly combed." *Id.* Additionally, male inmates' hair "must be cut so as to be above the ear, with sideburns no lower than the middle of the ear lobe and no longer in the back than the middle of the nape of the neck." *Id.*

Inmates may request a religious accommodation, and on August 18, 2015, Scott was provided a Certificate of Accommodation – Inmate Grooming by Chaplain William

Pearson. Doc. No. 44-4. The accommodation, which was cleared by Warden Burl, states: "Inmate stated on his religious affiliation update form: 'To grow our hair and beard 'not' cut off one hair but can average beard middle of chest and trim it up. Average growth of hair to middle of back average beard to middle chest.'" *Id.*[14] The Court interprets this accommodation to allow Scott to wear his hair long, to the middle of his back, and his beard to the middle of his chest, as a result of his religious beliefs. The record does not reflect that Scott requested an accommodation allowing him to wear his hair up, nor was he approved to wear his hair in such manner. Doc. No. 44-4. Scott disputes that he did not request an accommodation to wear his hair up, but provides no evidence to support that claim. Doc. No. 52 at 3. Regardless, the accommodation did not authorize Scott to wear his long hair up.

On January 29, 2016, at approximately 4:27 a.m., Scott was seen in the MSU Infirmary by Nurse Christina Robinson. *See* Scott's medical records dated January 29, 2016, Doc. No. 44-15 at 1. Scott claimed that he had been bitten by a spider. *Id.* The nurse noted:

> Inmate ambulatory, gait is steady and escorted by two correctional officers in shackles. Swelling noted to the right side of the Inmate's face near the mouth. Skin is warm and firm to touch. Inmate denies a tooth ache and in stated that he may have "busted a bump on his face last night." Inmate concerned that he was bit by a spider. No drainage noted. Resp even and unlabored, no acute distress noted.

---

[14] Scott denies this fact and cites Doc. No. 7-0 at 62. *See* Doc. No. 52 at 3. Docket number 7 in this case is a returned summons. However, docket number 7 in another case filed by Scott, No. 5:16-cv-00327, is an amended complaint. Page number 62 of that amended complaint is identical to the religious accommodation provided by defendants in this case at Doc. No. 44-4.

Doc. No. 44-15 at 1; Doc. No. 51 at 66.

Robinson gave Scott 200 mg of ibuprofen and placed him on the sick call list for further evaluation. Doc. No. 44-15 at 1. Scott adds that he was told to come back at shift change when the doctor arrived. Doc. No. 52 at 5.

At 9:30 a.m. that same morning, Scott informed RN Leona Mosby during pill call that he needed something for his face. Doc. No. 44-15 at 2. Nurse Mosby advised Scott to apply triple antibiotic ointment to the affected area, three times a day for three days, and to return to sick call if his symptoms did not improve. *Id.* Scott denies these facts, but only states that Nurse Mosby did not "know what it was," and gave him triple antibiotic ointment, thinking he had a sore. Doc. No. 52 at 5.

The medical entries by Nurses Robinson and Mosby make no reference to Scott being in any sort of distress or his condition being emergent in nature. Doc. No. 44-15.[15] Scott claims that after his medical jacket review at 10:00 a.m., Stout and Clark refused to let him go to the infirmary because his hair was up. Doc. No. 51 at 9. However, the record shows that LPN Hourigan examined Scott later on January 29, 2016. Doc. No. 51 at 122. She noted he had an abscess, put him on K-flex, an antibiotic, and referred him to dental on an emergency basis. *Id.*

---

[15] Scott denies this fact because he was later seen by a medical provider and given steroids because he had an abscess. Scott also claims that he was not allowed a copy of his medical jacket to prove this point, but he submits copies of additional medical records showing that he was seen by an LPN later on January 29, 2016, and by a dentist on February 5, 2016. *See* Doc. No. 51 at 122-123. The Court includes facts from those medical records as undisputed facts.

A dentist, Dr. Taliaferro, examined Scott on February 5, 2016. *Id.* at 123. Dr. Taliaferro noted that Scott's swelling had gone down and that he had no tooth problem or infection. *Id.* Dr. Taliaferro concluded that Scott needed no further treatment because medical was already treating him with antibiotics and pain medications. *Id.*

### b. Analysis

#### i. Deliberate Indifference to Serious Medical Condition

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). To succeed with an inadequate medical care claim, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it. *Id.; see also Farmer v. Brennan,* 511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). "When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured 'by reference to the *effect* of delay in treatment.'" *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quoting *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995)). An inmate making such an allegation is therefore required to "'place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment.'" *Id.* (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). If the inmate does

not, he fails to raise a genuine issue of fact on an essential element of his claim, and summary judgment is appropriate. *Id.*

Defendants contend that Scott was not denied medical treatment on the day in question. Doc. No. 45 at 24. It is undisputed that Scott was seen in the infirmary on January 29, 2016, at approximately 4:27 a.m., and that Scott was seen again by Nurse Mosby at pill call and given antibiotic ointment. Even if Stout and Clark refused to let Scott go to the infirmary mid-morning because his hair was up, Scott acknowledges that he was seen later the same day by an LPN who diagnosed him with an abscess, prescribed the medication K-flex, and referred Scott to dental as an emergency. Additionally, a dentist examined Scott on February 5, 2016, and noted there was no tooth problem and no additional treatment was necessary at that time because Scott was already on antibiotics and pain medications.

Scott has not submitted any evidence that a delay resulting from Stout and Clark's refusal to allow him to go to the infirmary worsened his condition. If Scott's need for treatment was obvious to a layperson, he is excused from producing such evidence. *See Williams v. Whitfield*, No. 2:09CV00100 JLH/BD, 2010 WL 4792146, at *2 (E.D. Ark. Nov. 17, 2010) (quoting *Roberson v. Bradshaw,* 198 F.3d 645, 648 (8th Cir.1999) ("'[W]e have repeatedly emphasized that the need or the deprivation alleged must be *either obvious to the lay person* or supported by medical evidence, like a physician's diagnosis.'") (emphasis in original). The medical records from that morning establish that Scott had a swollen face but no acute distress. *See* Doc. No. 44-15. There is no evidence to show that Scott's swollen face was so severe that Stout and Clark should have known he needed

emergency medical treatment.  Accordingly, Scott is required to produce verifying medical evidence to establish the detrimental effect of a delay in medical treatment.  *See e.g., Corwin v. City of Independence, MO*, 829 F.3d 695 (8th Cir. 2016) (summary judgment appropriate where pretrial detainee failed to produce verifying medical evidence showing a detrimental effect due to delay in treating fractured wrist).  Because Scott has produced no evidence to prove that a delay in seeing a nurse or doctor caused his condition to worsen, and because Scott in fact was treated later that same day, Stout and Clark should be granted summary judgment on Scott's deliberate indifference claim.

### ii.    *Religious Exercise/RLUIPA Claims*

Scott also alleges that Stout and Clark's refusal to allow him to go to the infirmary with his hair up violated his First Amendment right to freely exercise his religion and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  *See* Doc. No. 1 at 1 & 5-6.  Defendants maintain that Scott has not stated either a free exercise of religion or RLUIPA claim.

RLUIPA provides in part, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means."  42 U.S.C. § 2000cc-1(a)(1)-(2).  Likewise, a plaintiff cannot establish a First Amendment violation without demonstrating that a substantial burden was placed on his ability to practice his religion.  *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (to survive summary judgment motion, a plaintiff must first raise a question of material fact regarding whether a substantial burden was placed on his ability to practice

his religion).[16]  The United States Court of Appeals for the Eighth Circuit has held that, in order to constitute a "substantial burden" on the exercise of religion, a government policy or action must:

> …significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.

*Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 988 (8th Cir. 2004) (quoting *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997)) (alteration in original).[17]  The inmate "bear[s] the burden of establishing a *substantial* burden on a religious exercise."  *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009) (emphasis in original).

Scott received a religious accommodation allowing him to grow long hair and a beard.  He did not receive an accommodation allowing him to wear his hair up, and the record does not establish that he made such a request.  Scott has also produced no evidence to show he was routinely allowed to wear his hair up despite not having an accommodation that allowed him to do so. Nevertheless, for purposes of this recommendation, the Court

---

[16] "Once it is determined that a regulation imposes a substantial burden on a prisoner, the review of that burden under the Free Exercise Clause differs from [the Religious Freedom Restoration Act] and RLUIPA."  *Patel v. U.S. Bureau of Prisons,* 515 F.3d 807, 813 (8th Cir. 2008).  "If the prisoner fails to put forth sufficient evidence that his ability to practice his religion has been substantially burdened, then the court need not apply the *Turner* test to the Free Exercise claim and the strict scrutiny test to the RLUIPA claim."  *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 833 (8th Cir. 2009).

[17] The portions of this definition requiring religious beliefs to be a "central tenet" or "fundamental" may not apply to a RLUIPA claim.  *See* 42 U.S.C. § 2000cc–5(7)(A) (defining religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief").

assumes Scott's desire to wear his hair up is based on a sincerely held religious belief.  But even making that assumption, the Court finds that the one, isolated incident in issue in which Clark and Stout did not allow him to leave his cell with his hair up is insufficient to show a *substantial* burden on his sincerely held religious beliefs or his ability to practice his religion.  Accordingly, Scott's RLUIPA and free exercise claims fail and should be dismissed with prejudice.

Further, to the extent Scott claims he requested but was denied a broader accommodation that would allow him to keep his hair up,[18] he does not state a claim against Stout and Clark.  Any claim based on the denial of his requested accommodation must be brought in a separate lawsuit against the appropriate defendants.  There is no evidence that Stout and Clark were personally involved in the denial of such an accommodation.

### 4.    False Disciplinary/Retaliation Claim:  Defendants Thompson & Kennedy

The Court previously determined that a retaliatory false disciplinary claim survived defendants' motion for summary judgment on the issue of exhaustion.  *See* Doc. No. 38 at 4-5; Doc. No. 39.  The Court did not construe that claim as a due process claim based on a

---

[18] Scott claims that defendants refused to produce a copy of his accommodation request. Doc. No. 51 at 10.  He states that he

> explained to the ADC his religious belief as 'G' one God, the good of all religions and Rastafari to gain strength in our hair.  To grow twist and lock up naturally of oneself.  ADC defendants ran out of room on his religious script and didn't put all of Scott belief on his script.

*Id.* at 10-11.

false disciplinary,[19] but a claim that a false disciplinary was issued in retaliation for Scott filing a grievance.  Specifically, Scott alleges:

> The actions of Defendant Kennedy to retaliate on plaintiff for his previous use of grievance procedure against her, by abusing her authority and [conspiring] having her co worker Defendant Thompson write a falsified disciplinary report that Defendant Sgt. Kennedy found a "shank" in a cage Scott left in it 3 hr after he was shipped to a different unit.

Doc. No. 1 at 6, ¶ 49.

### a.  Undisputed Facts

On February 5, 2016, Thompson issued Scott a Major Disciplinary for possessing a shank.  Doc. No. 54-1 at 1.  On February 8, 2016, Stout reviewed the disciplinary and referred it to the Disciplinary Hearing Office to schedule a hearing.  *Id.*  Scott was notified of the disciplinary charges by Sedrick T. Franklin that day.  *Id.*

On February 16, 2016, Scott appeared before Disciplinary Hearing Officer Justine Minor for his disciplinary hearing.  *Id.* at 1-2.  Scott stated: "When I was served this disciplinary by Frank I was so drunk I dont know what was going on but how can they find a shank after I leave out I aint had no shank."  *Id.* at 2.  Scott was found guilty of a Major

---

[19] Scott's complaint allegations do not support a due process claim.  To state such a claim, a plaintiff must "demonstrate that he was deprived of life, liberty or property by government action."  *Phillips v. Norris,* 320 F.3d 844, 846 (8th Cir. 2003).  A prisoner has no liberty interest in having certain procedures followed in the disciplinary process; rather, the liberty interest arises from the "nature of the prisoner's confinement."  *Phillips,* 320 F.3d at 847.  An inmate has no liberty interest in avoiding segregated confinement, as long as the conditions do not amount to an "atypical and significant" hardship that would give rise to due process protection as set forth in *Sandin v. Conner,* 515 U.S. 472, 483-484 (1995).  The Eighth Circuit Court of Appeals has "consistently held that administrative and disciplinary segregation are not atypical and significant hardships under *Sandin.*"  *Portly-El v. Brill,* 288 F.3d 1063, 1065 (8th Cir. 2002).  Scott describes no change in conditions that could constitute the deprivation of a liberty interest after he was disciplined in February 2016.  Accordingly, he fails to state sufficient facts to support a due process claim based on an alleged false disciplinary.

27

Disciplinary for possession of a shank. *Id.* at 2. He was sentenced to serve 30 days in isolation and was reduced in class to Class IV. *Id.*

The evidence supporting the disciplinary was listed as: the staff report, the F-1 statement from the charging officer, a photo of evidence, 401 form, reviewed witness statement, and staff eye witness report. *Id.* Scott appealed the disciplinary findings but they were upheld. *Id.* at 2-3.

### b. Analysis

Retaliation against an inmate for his use of a prison grievance procedure is actionable. *See Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990) (per curiam) (otherwise proper acts are actionable under § 1983 if done in retaliation for grievances filed under established prison grievance procedure). However, the Eighth Circuit Court of Appeals has held that "if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail." *Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993). *See also Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir.1994) (prison disciplinary committee's finding, based on corrections officer's description of events, that prisoner actually violated prison regulations essentially "checkmate[d]" prisoner's retaliation claim), cert. denied, 515 U.S. 1145 (1995). The United States Supreme Court has held that in prison discipline cases, the requirements of due process are satisfied if "some evidence" supports the decision by the prison disciplinary board. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).

Scott claims that he could not have had a shank in his possession because Thompson had searched his cell before he was removed from the visitation cage and did not find a shank.  *Id.;* Doc. No. 51 at 13-14.  Scott also claims he was not allowed to present witness statements to support his position.  Doc. No. 51 at 13-14.  For evidentiary support for his claims, Scott points to the charge in the disciplinary report which stated:

> I, Cpl. Eddie Thompson II along with Sgt. Kennedy was in Big Visitation (Zone 3) cleaning up property from Inmate Scott, Deverick #131042 who transferred to another unit.  Approx. around 9:20 AM before Inmate Scott, Deverick was placed in cell #6 in Big Visitation (Zone 3) I Cpl. Thompson II search the cell and there was nothing in the cell.  When Sgt. Kennedy looked in the corner of cell #6 in Big Visitation and pulled out a brown piece of paper rolled up.  I Cpl. Thompson II then took the rolled up piece of paper and opened it up and discovered a shank that is approx. 6 inches in length.  Therefore I, Cpl. Eddie Thompson II am charging inmate Scott with the above rule violation 09-1.

Doc. No. 51 at 55.  Scott also provides his disciplinary appeal form (*id.* at 58); Crystal Neese's answers to requests for admission admitting that she was never asked to write a witness statement regarding the February 5, 2016 incident (*id.* at 86); Hunter Neal's answers to requests for admission admitting that he was never asked to write a witness statement regarding the February 5, 2016 incident (*id.* at 89); and Thompson's answers to requests for admission admitting that the shank was not found while Scott was being removed from the cell, that Scott was handcuffed and shackled while he entered the cage, that the shank was not found in Scott's personal possession, that he never saw Scott with the shank, and that the shank was not found in Scott's personal property while it was inventoried (*id.* at 101-102).

Scott's retaliation claim against Thompson or Kennedy fails as a matter of law. First, Scott offers nothing more than speculation that Kennedy or Thompson would be motivated to retaliate against him; he does not even identify which grievances he wrote against them that would cause them to want to retaliate against him. Second, the February 5, 2016 disciplinary report shows that there was some evidence to support the disciplinary Scott alleges was retaliatory. The report states that the hearing officer considered a 005 witness statement from staff, the charging officer's statement, and a photo of the weapon. Doc. No. 54 at 2. Scott does not allege or provide any evidence to show that the hearing officer, Justine Minor, was impartial. Finally, the evidence offered by Scott does not show that he requested Neese or Neal to provide witness statements or that their testimony would be material. In fact, the disciplinary report states that Scott's only statement in the hearing was: "When I was served this disciplinary by Frank I was so drunk I dont know what was going on but how can they find a shank after I leave out I aint had no shank." *Id.* Thus, "some evidence" supports Scott's conviction on the February 5, 2016 disciplinary charges, and the retaliation claim he asserts based on those charges should be dismissed with prejudice.

## C.    *State Law Claims*

Because Scott's constitutional claims are subject to dismissal, the Court should decline to exercise jurisdiction over Scott's state law tort claims. *See Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) (Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed).

## IV.  Conclusion

Defendants are entitled to summary judgment with respect to Scott's official capacity claims, and because Scott fails to establish a constitutional violation, defendants are entitled to qualified immunity as to Scott's individual capacity claims.  The undersigned recommends that the defendants' motion for summary judgment (Doc. No. 44) be granted, and Scott's claims against defendants be dismissed with prejudice.

DATED this 9th day of May, 2019.

_____
UNITED STATES MAGISTRATE JUDGE